```
             IN THE UNITED STATES DISTRICT COURT
              FOR THE SOUTHERN DISTRICT OF OHIO
                       EASTERN DIVISION
```

Amanda Nicole Rawls,              :

    Plaintiff,                :

  v.                             :       Case No. 2:13-cv-0412

Commissioner of Social            :       JUDGE ALGENON L. MARBLEY
   Security,                             Magistrate Judge Kemp
                                  :
    Defendant.


                    REPORT AND RECOMMENDATION

                      I.   Introduction

Plaintiff, Amanda Nicole Rawls, filed this action seeking review of a decision of the Commissioner of Social Security denying her application for disability insurance benefits.  That application was filed on April 23, 2010 and alleged that Plaintiff became disabled on September 30, 2001.

After initial administrative denials of her application, Plaintiff was given a videoconference hearing before an Administrative Law Judge on January 10, 2012.  In a decision dated February 10, 2012, the ALJ denied benefits.  That became the Commissioner's final decision on March 5, 2013, when the Appeals Council denied review.

After Plaintiff filed this case, the Commissioner filed the administrative record on July 8, 2013.  Plaintiff filed her statement of specific errors on August 8, 2013.  The Commissioner filed a response on October 22, 2013.  Plaintiff filed a reply brief on November 12, 2013, and the case is now ready to decide.

   II.   Plaintiff's Testimony at the Administrative Hearing

Plaintiff, who was 32 years old at the time of the administrative hearing and had completed three years of college, testified as follows.  Her testimony appears at pages 40-52 of

the administrative record.

Plaintiff last attempted to work in 2007.  She was a seasonal employee, working as a customer service representative, but became ill during that time; also, because it was seasonal employment, she was not asked to continue beyond the season.  She worked in 2006 as a receptionist but was let go due to missing too many days because of illness.  In 2001, she worked for Bank One as a data key operator, but lost her job when her department was eliminated.  She did not have any illness-related issues during that employment.

Plaintiff began receiving treatment for migraine headaches in 2002.  At that time, she suffered from headaches 15 times per month, which caused pain, blurred vision, nausea, and vomiting.  Eventually, she was diagnosed with pseudotumor cerebri (an unexplained increase in intracranial pressure), and she was referred to a neuro-opthalmologist, Dr. Epstein, who had been her treating physician ever since.  Her treatment since that time had included placement of a shunt, which reduced the severity of her headaches.  She had undergone several revisions of the shunt, and was, at the time of the hearing, still getting 9-12 headaches per month, which continued to cause pressure, nausea, vomiting and blurred vision.  They were helped but not eliminated by medication.

During a typical onset of a migraine, Plaintiff was unable to do much.  When she felt well, she could do household chores.  She often had no warning of their onset, and was unaware what triggered them.  Once a headache developed, Plaintiff took medication and remained upright because lying down made the pressure worse.  She would avoid any activity which might strain her eyes and otherwise minimized her daily activities.  She also tried to avoid excessive noise because it could cause additional pain.

III.  The Medical Records

   The medical records in this case are found beginning on page 246 of the administrative record.  The pertinent records can be summarized as follows.

   The first set of records consist of reports from Dr. Mankowski, to whom Plaintiff was referred by her regular physician.  At the first appointment, which took place on February 11, 2003, Plaintiff reported a history of intermittent headaches since age 10, becoming much more frequent in the past 3-4 months.  At that time, she experienced nausea and light sensitivity with her headaches, but no vomiting or visual changes.  Dr. Mankowski's impression was migraine headaches secondary to excessive Tylenol use, and he recommended discontinuation of that and other headache medications.  He started her on other medications and wanted to see her again in three months.  At the next appointment, Plaintiff's headaches were occurring with about the same frequency but were less severe.  He noted that she was at risk for pseudotumor cerebri and thought further workup was needed.  He recommended, among other things, a lumbar puncture.  Several weeks later, she was having fewer headaches, still without blurred or double vision.  Dr. Mankowski then referred her to Dr. Epstein for an opinion on pseudotumor cerebri.  When Dr. Mankowski saw Plaintiff in November, 2003, he noted that he agreed with Dr. Epstein's recommendation to treat her for pseudotumor cerebri, and also reported that Plaintiff's headaches had been reduced in frequency to four per month, and that they responded to either Lasix or Imitrix.  His last report, dated September 21, 2004, showed that Plaintiff was having only an occasional mild headache at that time.  He described her pseudotumor cerebri as "under reasonable control" and recommended some further testing based on her report

of some other health issues. (Tr. 246-56).

In 2005 (well after her last insured date), Plaintiff underwent a shunt placement procedure, performed by Dr. Shehadi. When she saw him seven weeks post surgery, she was totally headache-free, had discontinued prior medications, and reported no symptoms other than some intermittent nausea. Dr. Shehadi described her as "doing extremely well ...." (Tr. 289-90). Prior to the surgery, she had headaches and documented elevated cerebrospinal fluid pressure. (Tr. 294-95). Another of his office notes stated that Plaintiff had a "two-year history of headaches treated with partial relief on Topamax." (Tr. 296). Several years after the shunt was implanted, Plaintiff began to experience headaches again, and she was hospitalized briefly so the shunt catheter could be replaced. (Tr. 359-60). In the two years prior to that, however, she was described as having done "extremely well...." (Tr. 362).

Dr. Epstein completed a questionnaire in 2010, noting that he had first seen Plaintiff in 2003. Her symptoms in 2010 included headaches without optic nerve swelling or vision loss. She had been scheduled for another shunt revision in June of that year because the prior one had given her incomplete relief. He noted that her headaches were a nuisance but he was not aware of any work limitations resulting from them. (Tr. 451-52).

On July 26, 2010, Dr. Teague, a state agency physician, reviewed certain records from 2003 and concluded that there was insufficient evidence at that time to show disability from the alleged onset date to the last insured date. (Tr. 461). Dr. McKee, another state agency physician, concurred in that assessment. (Tr. 462).

The record does contain a substantial number of office notes from Dr. Epstein spanning more than seven years of treatment. A note of June 17, 2004 shows a decrease in the Plaintiff's

-4-

headaches from the beginning of the year, and Plaintiff also gave Dr. Epstein's office several calendars showing how often she had headaches and what time of day. She said that most of the days her headaches were not severe. A note from January, 2004, described her migraines as infrequent and her other headaches as decreasing in frequency. His earliest notes indicate that he prescribed furosemide for her headaches, which she did not take for a time due to having a urinary tract infection, that the medication had helped, and that when he first saw her in August, 2003, she had not had any migraines for the past month. (Tr. 653, 658).

### IV. The Vocational Testimony

A vocational expert, Mr. Kiger, also testified at the administrative hearing. His testimony begins at page 53 of the record.

Mr. Kiger identified Plaintiff's past work as a data key operator as sedentary and semi-skilled. He was then asked some questions about a hypothetical person who had no exertional limitations but who was limited to performing simple routine tasks in an environment without concentrated exposures to loud noises. According to Mr. Kiger, someone with those restrictions could not perform Plaintiff's past relevant work but could do jobs such as inspector or housekeeping cleaner. If the person were further required to wear tinted lenses to reduce glare from lighting, that would not change the jobs available. If, however, the person had to miss two days of work each month due to headache pain, that would eventually eliminate competitive employment. The same would be true for a person off task 15% of the time or who could not concentrate visually for up to an hour a day.

### V. The Administrative Law Judge's Decision

The Administrative Law Judge's decision appears at pages 19

through 27 of the administrative record.  The important findings in that decision are as follows.

The Administrative Law Judge found, first, that Plaintiff met the insured requirements for disability benefits through September 30, 2003, but not thereafter.  Next, Plaintiff had not engaged in substantial gainful activity from her alleged onset date of September 30, 2001 through her last insured date.  As far as Plaintiff's impairments are concerned, the ALJ found that Plaintiff had severe impairments including obesity, migraines, and pseudotumor cerebri.  The ALJ also found that these impairments did not, at any time, meet or equal the requirements of any section of the Listing of Impairments (20 C.F.R. Part 404, Subpart P, Appendix 1).

Moving to the next step of the sequential evaluation process, the ALJ found that Plaintiff had the residual functional capacity to perform work at all exertional levels, but was limited to the performance of simple, routine tasks in an environment without concentrated exposure to loud noises and which would allow her to wear tinted lenses as necessary to reduce glare.  The ALJ found that, with these restrictions, plaintiff could not perform her past relevant work, but could perform the jobs identified by Mr. Kiger, including inspector and housekeeping cleaner, and that such jobs existed in significant numbers in the regional and national economies.  Consequently, the ALJ concluded that plaintiff was not entitled to benefits.

VI.  <u>Plaintiff's Statement of Specific Errors</u>

In her statement of specific errors, Plaintiff raises the following issues.  She argues (1) that the ALJ did not correctly evaluate her credibility; and (2) that he improperly failed to appoint a medical expert to testify at the administrative hearing.  The Court generally reviews the administrative decision of a Social Security ALJ under this legal standard:

Standard of Review. Under the provisions of 42 U.S.C. Section 405(g), "[t]he findings of the Secretary [now the Commissioner] as to any fact, if supported by substantial evidence, shall be conclusive. . . ." Substantial evidence is "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion'" Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consolidated Edison Company v. NLRB, 305 U.S. 197, 229 (1938)). It is "'more than a mere scintilla.'" Id. LeMaster v. Weinberger, 533 F.2d 337, 339 (6th Cir. 1976). The Commissioner's findings of fact must be based upon the record as a whole. Harris v. Heckler, 756 F.2d 431, 435 (6th Cir. 1985); Houston v. Secretary, 736 F.2d 365, 366 (6th Cir. 1984); Fraley v. Secretary, 733 F.2d 437, 439-440 (6th Cir. 1984). In determining whether the Commissioner's decision is supported by substantial evidence, the Court must "'take into account whatever in the record fairly detracts from its weight.'" Beavers v. Secretary of Health, Education and Welfare, 577 F.2d 383, 387 (6th Cir. 1978) (quoting Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951)); Wages v. Secretary of Health and Human Services, 755 F.2d 495, 497 (6th Cir. 1985). Even if this Court would reach contrary conclusions of fact, the Commissioner's decision must be affirmed so long as that determination is supported by substantial evidence. Kinsella v. Schweiker, 708 F.2d 1058, 1059 (6th Cir. 1983).

Plaintiff's first argument is that the ALJ failed to assess her credibility properly by not articulating the bases for finding her testimony of disabling symptoms to be less than fully credible and by not discussing the various factors listed in Social Security Ruling 96-7p. The Commissioner responds by noting that the ALJ's assessment of Plaintiff's condition between February, 2003, when she first sought treatment for headaches, and September 30, 2003, or even a short time after that date, is

-7-

fully consistent with the medical records and that those records reveal only a mild impairment inconsistent with total disability. The Commissioner also points out that none of the doctors Plaintiff saw during this time expressed the opinion that she was disabled.

    The Commissioner is not permitted to reject allegations of disabling symptoms, including pain, solely because objective medical evidence is lacking, but must consider other evidence, including the claimant's daily activities, the duration, frequency, and intensity of the symptoms, precipitating and aggravating factors, medication (including side effects), treatment or therapy, and any other pertinent factors. 20 C.F.R. § 404.1529(c)(3).  SSR 96-7p requires an ALJ, when assessing a claimant's credibility, to "consider the entire case record, including the objective medical evidence, the individual's own statements about symptoms, statements and other information provided by treating or examining physicians or psychologists and other persons about the symptoms and how they affect the individual, and any other relevant evidence in the case record," and cautions that "[a]n individual's statements about the intensity and persistence of pain or other symptoms or about the effect the symptoms have on his or her ability to work may not be disregarded solely because they are not substantiated by objective medical evidence."

    Here, the record contained very little evidence about how severe Plaintiff's condition was other than the medical records from 2003 - those of Drs. Mankowski and Epstein - and her testimony.  Although the ALJ did not specifically go through the list of factors articulated in SSR 96-7p, the ALJ did consider what evidence there was, and Plaintiff does not point out, in her statement of errors, any evidence in the record relating to those various factors which the ALJ overlooked.  The Court therefore

finds no procedural error here, and its review is limited to whether the ALJ's credibility finding is substantially supported by the record.

This is one of those cases where, based on the evidence, the ALJ probably could have resolved the credibility issue either way without doing violence to the record. Plaintiff did report very frequent headaches to Dr. Mankowski when she first saw him. However, as the Commissioner points out, his subsequent treatment notes and the contemporaneous notes from Dr. Epstein indicate some improvement in her condition with treatment. From February through September, she had fewer headaches, they were not as severe, and the furosemide was helping. She was not working at the time, so there is no evidence about how her headaches might have been affecting her in the workplace. There is no question that in the years following 2003, her headaches got worse to the point where the implantation of a shunt was necessary, and that when the shunt malfunctioned her condition worsened, but those events really do not shed much light on how severe her limitations were in 2003. To be disabled during that time, she had to show that her headaches were frequent enough to cause her to miss work at least two days a month or to be off task at work for more than 15% of the time. One could draw that inference from the evidence, but it is not a mandatory conclusion and there is substantial evidence to the contrary. Given the inconsistencies between how severe Plaintiff described her condition when she testified in 2012 and how she and her doctors described that condition in 2003, the ALJ was justified in concluding it was not so severe that she could not do at least those jobs identified by the vocational expert. Her first claim of error is therefore without merit. See, e.g., Bartyzel v. Commissioner of Social Security, 74 Fed.Appx. 515, 523 (6th Cir. Aug. 26, 2003)("where the Commissioner's decision is supported by substantial evidence, it must be upheld even if the record might

support a contrary conclusion"), citing Smith v. Sec. of Health & Human Services, 893 F.2d 106, 108 (6th Cir. 1989).

Plaintiff's second argument is that the ALJ erred by not calling a medical expert to interpret the 2003 records, especially since the state agency reviewers did not have the benefit of Dr. Epstein's records from that time period.  In response, the Commissioner argues that Dr. Epstein's notes did not add anything of significance to the record other than showing that Plaintiff's headaches had responded well to medication.

As the court observed in Griffin v. Astrue, 2009 WL 633043 *10 (S.D. Ohio March 6, 2009), "[t]he primary function of a medical expert is to explain, in terms that the ALJ, who is not a medical professional, may understand, the medical terms and findings contained in medical reports in complex cases."  Whether to call such an expert to testify is generally left to the discretion of the ALJ, see id., quoting Haywood v. Sullivan, 888 F.2d 1463, 1467–68 (5th Cir. 1989), and the Court may overturn the exercise of that discretion only if it appears that the use of a medical consultant was necessary — rather than simply helpful — in order to allow the ALJ to make a proper decision. See Landsaw v. Sec'y of Health & Human Services, 803 F.2d 211, 214 (6th Cir. 1986), quoting Turner v. Califano, 563 F.2d 669, 671 (5th Cir. 1977).

Plaintiff spends much of her argument contending that when the onset date of a progressive illness is difficult to determine, SSR 83-20 comes into play.  She specifically cites to portions of that ruling which state that the decision as to an onset date "must have a legitimate medical basis" and "[a]t the hearing, the administrative law judge (ALJ) should call on the services of a medical advisor when onset must be inferred.  If there is information in the file indicating that additional medical evidence concerning onset is available, such evidence should be secured before inferences are made."

-10-

Here, the ALJ did suggest that Plaintiff may have become disabled at some point in time, but he did not make any specific determination to that effect (because, in a Title II case, he did not have to), nor did he suggest that the key issue was determining the onset date of disability in a case involving a progressive illness. In fact, the records show that Plaintiff's condition both improved and deteriorated at various times over the seven or eight years for which medical records were available. The real question in this case is whether the medical records concerning Plaintiff's condition in 2003 were so complex or difficult to understand that the ALJ needed an expert to interpret them. The Court does not reach that conclusion.

It is true that there were a few comments in those records, such as the level of intracranial pressure and whether it was "mild" in severity, which might have required some interpretation. Overall, though, the key issue was simply how often Plaintiff suffered from truly debilitating headaches. The records were sufficiently understandable on that issue to permit the ALJ to interpret them without much assistance. Further, the state agency physicians did interpret Dr. Mankowski's records; it was only the records from Dr. Epstein which were submitted after their review. There is nothing in this record compelling the conclusion that those records, which seemed fairly clear both on the frequency of Plaintiff's migraine headaches and the effect of medication on them, so complicated the medical issues that the ALJ could no longer properly understand the entirety of the medical evidence without further specialized assistance. Consequently, the ALJ did not abuse his discretion by failing to call a medical expert to testify at the administrative hearing.

### VII.  Recommended Decision

Based on the above discussion, it is recommended that the plaintiff's statement of errors be overruled and that judgment be entered in favor of the defendant Commissioner of Social

Security.

### VIII.  Procedure on Objections

If any party objects to this Report and Recommendation, that party may, within fourteen (14) days of the date of this Report, file and serve on all parties written objections to those specific proposed findings or recommendations to which objection is made, together with supporting authority for the objection(s). A judge of this Court shall make a de novo determination of those portions  of the report or specified proposed findings or recommendations to which objection is made.  Upon proper objections, a judge of this Court may accept, reject, or modify, in whole or in part, the findings or recommendations made herein, may receive further evidence or may recommit this matter to the magistrate judge with instructions.  28 U.S.C. §636(b)(1).

The parties are specifically advised that failure to object to the Report and Recommendation will result in a waiver of the right to have the district judge review the Report and Recommendation de novo, and also operates as a waiver of the right to appeal the decision of the District Court adopting the Report and Recommendation.  See Thomas v. Arn, 474 U.S. 140 (1985); United States v. Walters, 638 F.2d 947 (6th Cir. 1981).

/s/ Terence P. Kemp
United States Magistrate Judge